UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
**LEXINGTON**

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) Criminal Action No. 05-162-S-JMH |
| | ) |
| | ) |
| v. | ) |
| | ) |
| | ) **MEMORANDUM OPINION AND ORDER** |
| JACKIE DALE MULLIKIN, | ) |
| | ) |
| Defendant. | ) |
| | ) |
| | ) |

**       **       **       **       **

Before the Court is Defendant's motion to suppress [Record No. 20] to which the government responded [Record No. 21]. The Court held an evidentiary hearing on February 21, 2006, and ordered supplemental briefing. After considering the matter and for the following reasons, the Court denies Defendant's motion.

**Background**

Defendant is charged with robbing two banks and seven gas stations and motels that took place on June 18, June 26, and June 27, 2005. Defendant's motion moves to suppress statements made at a motel he was staying at when he was arrested, and statements made at the police station following his arrest, as well as evidence found as a result of a search warrant for the motel room that was based on these statements.

On June 28, 2005, the Lexington Police Department received two anonymous tips concerning a recent string of bank and motel

robberies.  The callers identified Defendant as committing the robberies and one caller stated that Defendant and his wife, Stacey Brooks ("Brooks"), were staying at the Continental Inn in Lexington, Kentucky.  The caller also stated that there was an active warrant for Brooks's arrest.

The lead detective on the case, Detective Jody Stowers ("Detective Stowers"), investigated the tips and verified that there was an active bench warrant for Brooks issued by the Fayette District Court for failure to pay a fine.  Detective Stowers proceeded to the Continental with four other officers to arrest Brooks and to speak to Defendant about the recent robberies.  The detectives did not have a written copy of the warrant and did not have a search warrant for the motel room.  Detective Stowers testified at the evidentiary hearing that he did not have probable cause to arrest Defendant prior to going to the motel.

Upon arriving at the Continental, the detectives spoke with the manager of the motel who told them that Brooks was registered to Room 307.  After knocking and announcing their presence for several minutes, and hearing a television in the background, the detectives asked the manager to open the door with the master key. The manager complied and the detectives went into the room.

The detectives immediately performed a security sweep and arrested Brooks on the bench warrant.  She was taken outside for questioning concerning her husband's involvement in the recent

robberies to which she responded that Defendant was the person in the surveillance videos that were on the news. Detective Stowers testified that at this point he thought there was probable cause for Defendant's arrest.

Detective Stowers then came back into the room and along with Detective Elizabeth Adams ("Detective Adams") questioned Defendant. Specifically, Detective Stowers testified at the evidentiary hearing that he asked Defendant, "Do you know what we're here for?" to which Defendant responded, "I'm going to [the] federal penitentiary, and I've been all over the news." (Suppression Hr'g Tr. 13, Feb. 21, 2006.) Defendant was then handcuffed and placed under arrest.

Detective Adams testified that while in the motel room, Defendant "stated he was thinking about getting a lawyer." (*Id.* 72.) Detective Adams stated that Defendant told them that his lawyer was in Louisville and that "he didn't want to pay for the lawyer because he had used him before and paid a lot of money and it hadn't helped him." Detective Adams testified that she could not remember the exact words used. (*Id.* 72, 87.) Concerning Defendant's statements about a lawyer, Detective Stowers testified that Defendant said, "I think I might need a lawyer" and "that he had a lawyer in the past in Louisville and spent a great deal of money on him, but advised that he didn't do anything – he wasn't – didn't do anything for him." (*Id.* 14-15.) In response to this

3

statement, Detective Stowers said, "We asked him we can get that lawyer for him; we can call him.  If he did not want that lawyer, we can attempt to get one for him.  He advised at that point that he did not want a lawyer."  (*Id*. 15.)

Detective Adams testified that Defendant was sitting up straight, speaking clearly, did not appear to have any trouble understanding the questions at the motel and did not have any trouble walking down the stairs.  Detective Stowers's testimony concurred that Defendant appeared to be sober at the motel. Detective Stowers stated that he did not observe any syringes or drug-related items at the motel, but Detective Adams and Sergeant Pete Ford ("Sergeant Ford") both observed syringes and vials in plain sight.

Defendant was then transported to the Lexington Police Department where he was interviewed by Detective Stowers and Sergeant Ford.  Defendant was *Mirandized* at the beginning of the interrogation and an Acknowledgment of Rights form was filled out by Detective Stowers, but was not signed by Defendant.  The form noted that Defendant told the detectives that he had consumed cocaine and twelve Xanax pills within four hours of the interrogation.  The tape of the interrogation reveals that Detective Stowers asked Defendant if he was sober and Defendant replied that he was.  Detective Stowers testified at the hearing that he weighed what Defendant had told him concerning the amount

4

of drugs Defendant consumed and "decided to proceed on because it appeared that he was clear and coherent and not of the influence." (*Id.* 54.)   After being *Mirandized,* Defendant was asked if he understood his rights and wished to talk to the officers without an attorney.   Defendant replied "Yes, sir.".

At the hearing, Defendant testified that he began using drugs on the day before his arrest at about 4:30 or 5:00 p.m. until 4:00 or 5:00 a.m., starting with four to five grams of powder cocaine that was snorted and consumed intravenously.   Defendant then asked his wife to buy some Xanax so that he could "come down" off the cocaine, which she did.   He testified that he took at least fifteen pills at around 5:30 or 6:00 a.m. and passed out around 7:00 or 8:00 a.m., when he was awakened by the police entering the room. He testified that the officers rushed his wife out of the room and then came back in and handcuffed him.   Defendant stated that the officers asked him if he knew why they were there and Defendant told them he did not know.   Defendant testified, "I told them I needed to talk to my attorney that was in Louisville[,]" and that the officers replied that he did not need a lawyer.   (*Id.* 142-43.)

Defendant testified that the officers woke him up at the station for questioning.   He stated he only remembers showing the bruises from injecting cocaine in his arms to Sergeant Ford, but does not remember anything else about the interview.   Defendant called an expert, Dr. Timothy Allen ("Dr. Allen"), to testify as to

Defendant's ability to waive his rights.  Dr Allen testified that Defendant told him that he took fifteen Xanax pills in order to come down from using four grams of cocaine intravenously.  The doctor testified that when taken intravenously, cocaine has a much stronger effect.  Defendant told the doctor that soon after he took the Xanax pills, he was arrested.  Dr. Allen testified that fifteen Xanax pills would make most people sedated and for Defendant would have sedated him but for the cocaine he ingested.

The doctor concluded that Defendant's higher functioning, like cognition, ability to think through problems, and ability to understand, would be impaired severely.  The doctor testified that a fifteen milligram dose of Xanax causes anterograde amnesia, which makes the user forget what has happened in the interim.  He reported that Defendant would be able to sound like he knew what he was talking about, but his ability to make more complex decisions, such as waiving his rights would be impaired.  On cross, the doctor conceded that his evaluation of Defendant was based in full on Defendant's account of how many drugs Defendant stated he consumed, but the doctor testified that he thought Defendant was being truthful.

The interview at the station lasted for an hour and a half and was recorded on audio tape.  During the interrogation, Defendant admitted to two bank robberies and seven robberies of motels and gas stations.  Sergeant Ford testified that during the

6

interrogation, Defendant acted coherent and did not fall asleep or "nod off" at any time.  During the interrogation, Defendant was not given any food or beverages, nor did he request any.  Defendant asked for a break to smoke a cigarette several times, which the officers promised but did not provide.  The next day, Detective Stowers and another detective questioned Defendant about a robbery in Atlanta, Georgia.

### Analysis

*A.   Entry into the Motel and Seizure of Defendant*

Defendant argues that the initial entry into the motel room and seizure of Defendant was illegal because the detectives entered the motel room without a search warrant.  Defendant argues that the motel manager did not have authority to consent to entry of the locked motel room and that the officers used Brooks's arrest warrant as merely pre-text for entry into the room and seizure of Defendant.  Defendant asserts that the officers did not have a paper copy of Brooks's arrest warrant, which he alleges supports the argument that the arrest of Brooks was pretext for entering the room and questioning the occupants about the recent robberies.  Additionally, Defendant argues that there is little or no authority to enter a private dwelling to effectuate a *misdemeanor* warrant for the purpose of questioning another occupant on a separate felony charge without a search warrant or an arrest warrant for that occupant.

It has long been held that "an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." *Payton v. New York*, 445 U.S. 573, 602-03 (1980); *United States v. Buckner*, 717 F.2d 297, 300 (6th Cir. 1983); John R. Kennel,6A C.J.S. Arrest § 56, June 2005 ("An officer who has a warrant for the arrest of a person is entitled, after proper notice and demand, to peaceably enter a dwelling where the officer reasonably believes the person to be arrested will be found and to effect an arrest.")

In the instant case, the Court finds that the entry was proper because the officers had a valid warrant for Brooks and reason to believe she was in Room 307.  The anonymous caller stated Brooks was staying at the Continental, which was confirmed by the motel's manager prior to the detectives' entry.  The manager showed the detectives that Brooks's name was on the motel receipt for Room 307.  The detectives repeatedly knocked and announced their presence and no one answered, even though there was a television on in the room.  The detectives then directed the manager to open the door because they had reason to believe Brooks was currently inside the room.

It is of no consequence that the motel manager opened the door without the occupants' consent because the detectives had the authority to enter Brooks's room to effect her arrest.  *United*

8

*States v. Davis*, No. 2:05-CR-28, 2005 WL 2088591, at *3 (6th Cir. Aug. 22, 2005) (unpub.) (Citing *Payton*, the court held that it was proper for officers to forcibly enter the occupant's hotel room because "[t]he officers had a warrant for the defendant's arrest, and they knew he was in the room.  Nothing else was needed.").

Further, it does not matter that the warrant was a bench warrant for non-payment of fines, as opposed to a felony warrant, because the *Payton* rule is not limited to felonies.  *Swales v. Township of Ravenna*, 989 F. Supp. 925, 931, 936 (N.D. Ohio 1997) (holding that in executing warrant for misdemeanor assault, "the officers were justified in entering the . . . residence in order to execute the warrant"); *Kain v. Nesbitt*, 156 F.3d 669, 672 (6th Cir. 1998) (assuming but not deciding that officers may enter a residence to effect a misdemeanor warrant for traffic violations); *Jackson v. Hoylman,* Nos. 92-3554, 92-3607, 1993 WL 501591, at *1-2, 4 (6th Cir. Dec. 3, 1993) (unpub.) (§ 1983 action where the court held that under *Payton*, the marshals' entry into the occupant's home to effectuate a bench warrant for failure to appear for grand jury service was proper because the marshals had reason to believe the person lived there, the officers knocked and announced their presence, and they had reason to believe the occupant was in the house refusing to answer the door); *Hunter v. Smith*, No. 94-71088, 1996 WL 426541, at *2 (E.D. Mich. Feb. 2, 1996) (unpub.) (§ 1983 case holding that "bench warrants are included" in *Payton's* limited

9

authority to enter dwellings to effect an arrest warrant).

Other circuits have also held this practice is constitutional. *United States v. Spencer*, 684 F.2d 220, 223 (2d Cir. 1982) (bench warrant for failure to appear for a misdemeanor domestic violence charge); *United States v. Clayton*, 210 F.3d 841, 843-44 (8th Cir. 2000) ("We agree with those courts that have held that [*Payton*] applies with equal force to misdemeanor warrants."); *United States v. Meindl*, 83 F. Supp. 2d 1207, 1215 (D. Kan. 1999) (upholding entry to effect misdemeanor warrant for driving with a suspended licence); *Smith v. Tolley*, 960 F. Supp. 977, 991 (E.D. Va. 1997) (because *Payton* relied on the fact that warrants are issued by a neutral and detached magistrate, "[o]nce that judicial approval was given, it makes no federal, constitutional difference that the warrant was issued in the form of a bench warrant for failure to appear on a misdemeanor offense").

Defendant's Supreme Court cases finding entry into a hotel room by police illegal are distinguished. In *Lustig v. United States*, 338 U.S. 74, 76 (1949), the Court held that the search of the hotel room was not incident to an arrest because the occupants of the room were never present in the room. *Id.* at 79-80. In *United States v. Jeffers*, 342 U.S. 48, 52-54 (1951), and *Stoner v. California*, 376 U.S. 483, 484-86 (1964), the Court held that entry was illegal because the officers did not have a search or arrest warrant for an occupant of the room.

10

Defendant's argument that the warrant for Brooks's arrest was pretextual is not supported by the evidence. For instance, Detective Stowers testified that they went to the motel for the *dual* purpose of arresting Brooks on the warrant and to discuss the recent robberies with the occupants. The fact that the detectives did not have the actual written warrant on hand does not show entry to serve the warrant was pretextual because the detectives were not required to have the written warrant on hand. Ky. R. Crim. P. 2.10(1). There is simply no evidence that the detectives acted in bad faith in executing the valid warrant for Brooks's arrest.

Once validly in the motel room, the detectives immediately arrested Brooks and then secured information from her about Defendant, namely that she recognized her husband on the surveillance videos from the robberies. This information gave the detectives probable cause that Defendant committed said robberies and, with that, the authority to arrest Defendant on the premises without a warrant for his arrest. *United States v. Caicedo,* 85 F.3d 1184, 1192 (6th Cir. 1996) ("Police may arrest a person without a warrant if they have probable cause at the time of the arrest to believe that the person has committed or is committing a crime."); *Crockett v. Cumberland Coll.*, 316 F.3d 571, 580 (6th Cir. 2003) ("For a police officer to have probable cause for arrest, there must be 'facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one

11

of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing or is about to commit an offense.'") (quoting *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979)). Brooks's identification of Defendant as the person on the surveillance videos provided the detectives with facts sufficient for a prudent person to believe that Defendant committed the robberies. Therefore, the officers had probable cause to arrest Defendant.

B.   *Questioning at Motel Prior to Miranda Warnings*

After obtaining probable cause to arrest Defendant, Detective Stowers went back into the room to arrest Defendant, but before he did, he asked Defendant, "Do you know what we're here for?" to which Defendant responded, "I'm going to [the] federal penitentiary, and I've been all over the news." (Hr'g Tr. 13.) At the hearing, Detective Stowers was asked whether Defendant was under arrest at this point and he responded, "Not at that point. And then *after* that, I placed him under arrest." (*Id.*) (emphasis added).

About the exchange, Detective Adams testified,

> A.   We put Brooks into handcuffs, and announced that we were there to serve a warrant. Mr. Mullikin sat on the side of the bed. And then several people went out to the hallway to speak to her about the warrant. Then Detective Stowers and I explained to Mr. Mullikin that we would like to speak to him about robberies that had occurred in Lexington.

> Q.    Okay.    Did  Mr.  Mullikin  make  any
> statements to you in response to that?
>
> A.   He said that he had seen himself on
> television.  And we explained that we'd like
> to talk to him downtown about things, not here
> at the scene.

(*Id.* 72.)

Defendant, on the other hand, testified that "[the officers] rushed my wife outside the room and come back in and put me in handcuffs." (*Id.* 140.)  Defendant testified the detectives did not tell him why they were there and that he asked them what they were doing in the room and the detectives "said they were there over some robberies." (*Id.*)   Defendant then testified that he was handcuffed on the bed by Detective Stowers and told he was under arrest.  (*Id.* 141.)

Defendant moves for this statement to be suppressed because he was not *Mirandized* prior to the question.   He argues in the supplemental brief that he was handcuffed and that probable cause was established at the point Defendant was interrogated.   Thus, Defendant argues, the motel room statement should be suppressed because he was subjected to custodial interrogation without being warned of his rights.

The Supreme Court in *Miranda v. Arizona*, 384 U.S. 436 (1966), held that statements given in response to custodial interrogation without proper *Miranda* warnings must be suppressed.  *Id.* at 444. In order to determine if a person is in custody, the Court looks to

13

the totality of the circumstances and analyzes whether a person in the suspect's position would think he were in custody. *United States v. Swanson*, 341 F.3d 524, 528 (6th Cir. 2003). A suspect is in custody if there is a formal arrest "or restraint on freedom of movement of the degree associated with a formal arrest". *Id.* at 529. The Sixth Circuit has noted that courts should assess,

> (1) the purpose of the questioning; (2) whether the place of the questioning was hostile or coercive; (3) the length of the questioning; and (4) other indicia of custody such as whether the suspect was informed at the time that the questioning was voluntary or that the suspect was free to leave or to request the officers to do so; whether the suspect possessed unrestrained freedom of movement during questioning; and whether the suspect initiated contact with the police . . . [or] acquiesced to their requests to answer some questions.

*Id.* "This inquiry is an objective test, and it does not depend on the subjective views of either the interrogating officers or the individual being questioned." *United States v. Teemer*, 260 F. Supp. 2d 187, 192 (D. Me. 2003). The fact that there is probable cause to arrest the suspect does not necessarily mean that *Miranda* warnings should be given. *United States v. Ozuna*, 170 F.3d 654, 658 (6th Cir. 1999).

Even if a suspect is "in custody", he must also be subjected to interrogation in order for a statement made without *Miranda* warnings to be suppressed. The Supreme Court defined interrogation as "express questioning or its functional equivalent." *Rhode*

14

*Island v. Innis*, 446 U.S. 291, 300-01 (1980). The Court concluded that "the term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id.* at 301.

Looking at the relevant facts in the instant case, the Court finds that Defendant was not in custody when Detective Stowers asked Defendant the question. Detective Stowers's testimony was credible that Defendant was not handcuffed or arrested until *after* Defendant made the statement about being on the news. (Hr'g Tr. 41.) The purpose of the questioning is unclear, but was limited to one question, "Do you know why we're here?" The detectives did not proceed with any further questions concerning the robberies and, in fact, told Defendant that they did not want to talk to him until the got to the station. Although Detective Adams testified she kept Defendant in her line of sight while the other detectives were arresting and questioning Brooks, Defendant just remained on the bed without any force making him remain there. (*Id.* 72-74.) The fact that the questioning occurred in a motel room, like a home, is much less coercive an environment than a police station and courts have often held that suspects were not in custody in similar situations. *United States v. Hicks,* 967 F. Supp. 242, 246 (E.D.

15

Mich. 1997)[1] (and cases cited therein); *see also United States v. Burns*, 37 F.3d 276, 281 (7th Cir. 1994) (suspect who was detained a in hotel room for ten minutes while officers executed search warrant was not in custody).

Because the Court does not find that Defendant was in custody until he was arrested and placed in handcuffs, which was after Defendant made the statement in the motel room, the Court does not have to reach the issue of whether Defendant was subjected to "interrogation". *Swanson*, 341 F.3d at 528. Therefore, the statement made in the motel room was not in violation of *Miranda* and is not subject to suppression.

C.   *Invocation of Right to Counsel*

Immediately after Defendant made the incriminating statement in the motel room and was subsequently arrested, a dialogue began concerning whether Defendant requested a lawyer. Detective Stowers testified that after Defendant was arrested, "He stated that I think I might need a lawyer. He advised that he had a lawyer in the past in Louisville and spent a great deal of money on him, but advised that he didn't do anything - he wasn't - didn't do anything

---

[1] The court in *Hicks* noted that the defendant was not the focus of the investigation, which is different than the instant case. The Sixth Circuit has held, however, that this fact alone does not mean that *Miranda* warnings should be given. *United States v. Ozuna*, 170 F.3d 654, 658 (6th Cir. 1999) (holding that probable cause to arrest does not necessarily mean warnings should be given).

for him." (Hr'g Tr. 44, 14-15.)  Detective Stowers testified that in response to this statement, "We asked him we can get that lawyer for him; we can call him.  If he did not want that lawyer, we can attempt to get one for him.  He advised at that point that he did not want a lawyer." (*Id*. 15.)  Detective Adams concurred with this testimony, but could not remember the exact words Defendant used. (*Id*. 87.)

Defendant, on the other hand, testified that "I told them I needed to talk to my attorney that was in Louisville." (*Id*. 142.) He did not recall giving the detectives the name of his lawyer. Defendant testified that Detective Stowers told Defendant in response, "You don't need a lawyer." (*Id*. 143.)

If a suspect clearly invokes his right to have counsel present, then no further questioning is permitted. *Edwards v. Arizona*, 451 U.S. 477, 483-84 (1981).  The invocation, however, must be clear in order for the right to be invoked. *Davis v. United States*, 512 U.S. 452, 462 (1994).  In *Davis*, the Supreme Court held that further questioning was permitted after the suspect said, "maybe I should talk to a lawyer", because the statement was too equivocal to invoke the suspect's right to counsel.  The Court held that a suspect "must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Id*. at 459.  The Court noted that officers do

17

not have to ask clarifying questions, but they are free to if the request is ambiguous or equivocal. *Id.* at 462.

The Court finds that Defendant did not invoke his right to counsel because the statement was equivocal and ambiguous. The credible testimony of Detective Stowers shows that Defendant stated, "I think I might need a lawyer" in Louisville. Although the detectives did not have to ask clarifying questions, they sought to clarify Defendant's statements and were told by Defendant that he did not want a lawyer. At the station, Defendant was read his rights and did not again make any statements concerning wanting a lawyer.

This situation is similar to *Burket v. Angelone,* 208 F.3d 172, 198 (4th Cir. 2000), where the Fourth Circuit found the statement "I think I need a lawyer" was equivocal because it was "quite similar to the defendant's statement in *Davis* ('Maybe I should talk to a lawyer'), which the Supreme Court found ambiguous." Other courts have also held that similar statements are ambiguous and do not invoke a suspect's right to counsel. *See, e.g., Clark v. Murphy*, 331 F.3d 1062, 1069-1072 (9th Cir. 2003) ("I think I would like to talk to a lawyer"); *Diaz v. Senkowski*, 76 F.3d 61, 63-65 (2d Cir. 1996) ("Do you think I need a lawyer?"); *see also Arnold v. Runnels*, 421 F.3d 859, 866 (9th Cir. 2005) (holding that suspect's statement that he "did not want to talk on tape" was a clear invocation of a right to be silent and noting that the

18

statement was not qualified with words like "maybe" and "I think").

One Sixth Circuit case held that the statement, "Maybe I should talk to an attorney by the name of William Evans," was an unequivocal invocation of the suspect's right to counsel. *Abela v. Martin*, 380 F.3d 915, 926 (6th Cir. 2004). Unlike the instant case, the suspect in *Abela* specifically mentioned the name of his attorney and handed the officers the attorney's card. *Id.* In *Kyger v. Carlton*, 146 F.3d 374, 376, 379-80 (6th Cir. 1998), the suspect stated, "I'd just as soon have an attorney", which the Sixth Circuit found to be unambiguous. Defendant's statement in the instant case "I think I might need a lawyer" is unlike the statement in *Kyger* because Defendant's statement uses the words "think" and "might", which connote that he is thinking about a attorney, but has not decided whether he wants one. In *Kyger*, however, it is clear the suspect has already thought it over and decided he would rather have an attorney present.

Therefore, because Defendant did not unequivocally invoke his right to counsel, further questioning after being *Mirandized* at the station was proper.

D.   *Validity of Waiver of* Miranda *Rights*

After being brought to the station, Defendant was *Mirandized* and orally waived his right to counsel and to an attorney. Defendant argues that the waiver was not voluntary, knowing, or intelligent because he was severely intoxicated and does not

remember the interview which, he argues, was supported by uncontroverted expert testimony. He argues that the officers knew he was intoxicated because of the paraphernalia in plain sight and the fact that Defendant told the officers that he consumed an excessive amount of drugs. Finally, he argues that the waiver was invalid because the interview lasted an hour and a half and he received no breaks, food, or water.

In order to validly waive *Miranda* rights, the waiver must be voluntary, knowing, and intelligent. The Supreme Court has articulated a test to determine the validity of a waiver of *Miranda* rights:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

*Moran v. Burbine*, 475 U.S. 412, 421 (1986). It is the government's burden to prove the waiver was voluntary, knowing, and intelligent by a preponderance of the evidence. *Colorado v. Connelly*, 479 U.S. 157, 168 (1986). A suspect's intoxication or mental impairment does not make a confession involuntary unless some level of police coercion is present. *Id.* at 164-70; *Clark v. Mitchell*, 425 F.3d

270, 283 (6th Cir. 2005); *United States v. Newman*, 889 F.2d 88, 94-95 (6th Cir. 1989).

Miranda waivers must also be knowing and intelligent. *Colorado v. Spring*, 479 U.S. 564, 574 (1987). "The Constitution does not require that a criminal suspect know and understand every possible consequence of a waiver of the Fifth Amendment privilege." *Id.* A waiver is knowing and intelligent if the totality of the circumstances show that Defendant understood his rights and the consequences of waiving those rights. *Clark*, 425 F.3d at 284.

Based on the evidence submitted at the hearing, and after reviewing the tape of the confession, the Court finds that Defendant made a voluntary waiver of his rights because there is no evidence of coercion. First, Dr. Allen's testimony of Defendant's ability to validly waive his rights was based in full on *Defendant's* account of the amount of drugs he used. Second, the Court finds it incredible that Defendant was able to remember very specific things from the night of his arrest, like the fact that he was handcuffed before being arrested and the exact words he used concerning a lawyer in Louisville, but does not remember anything else. During the interrogation, Defendant sounded coherent and gave very detailed accounts of the robberies, including what he wore. *United States v. Reynolds*, 367 F.3d 294, 299 (5th Cir. 2004) (confession voluntary where the defendant had ingested methamphetamine one hour prior to the interview and interrogating

21

officers testified that the defendant was cooperative and answered questions appropriately with very detailed accounts of the robberies).

Although the Acknowledgment of Rights form states that Defendant told the detectives he consumed cocaine and twelve Xanax pills within four hours, he testified to a higher amount at the hearing and to Dr. Allen, harming his credibility with the Court. The detectives interviewing him and arriving at the scene all testified that Defendant did not appear to be intoxicated, sat independently on the bed, walked down the stairs without assistance, and over-all appeared sober. Detective Adams and Sergeant Ford saw drug paraphernalia on the scene, but as Defendant appeared sober to the detectives and Sergeant Ford, who have experience with intoxicated suspects, this fact is not significant.

Further, the fact that the interview was only recorded on audio does not support that the waiver was involuntary, nor does the fact that the Acknowledgment of Rights form was unsigned. On the audio tape, the Court can assess Defendant's demeanor, speech, and tone. Even though Defendant did not sign the Acknowledgment of Rights form, he stated on the tape that he waived his rights after being fully apprised of them. *See United States v. Miggins*, 302 F.3d 384, 397 (6th Cir. 2002) (holding that failure to sign waiver form does not show the waiver was knowing, intelligent, and voluntary).

The length of the interrogation also does not show coercion because interrogations much longer than an hour and a half have been held to be valid. *Ledbetter v. Edwards*, 35 F.3d 1062, 1070 (6th Cir. 1994) (three hour interrogation lasting until 3:00 a.m. was not coercive). Finally, Defendant never asked for food or water during the interrogation and a break was not necessary during such a short interrogation. Therefore, based on the preceding, the confession is not subject to suppression because Defendant voluntarily waived his rights.

The only factors bearing on whether the waiver was knowing or intelligent are Defendant's allegations of intoxication, Dr. Allen's testimony that Defendant's IQ was low average, and that Defendant did not sign the waiver form, which the Court finds do not show that the waiver was not knowing and intelligent.

First, Defendant's low average IQ is not dispositive. *Clark,* 425 F.3d at 284. Nor is the fact that he did not sign the waiver form because, as stated above, the tape shows that Defendant orally waived his rights after being fully advised of them immediately prior to the interrogation. As noted *supra*, the Court does not find Defendant's account of the amount of drugs he consumed or its effects credible because of the inconsistencies in his testimony and the fact that the detectives all testified that Defendant appeared to not be intoxicated and to fully understand his rights. Finally, this is not Defendant's first experience with the criminal

justice system, which does have a bearing on his ability to fully comprehend his rights and the consequences of waiving them. *Ledbetter*, 35 F.3d at 1070. Therefore, based on the totality of circumstances, the Court finds that Defendant voluntarily, knowingly, and intelligently waived his rights.[2]

### Conclusion

Accordingly, and for the foregoing reasons, **IT IS ORDERED** that Defendant's motion to suppress [Record No. 20] be, and the same hereby is, **DENIED**.

This the 16th day of June, 2006.



Signed By:

*Joseph M. Hood*

United States District Judge

---

[2] Because the Court does not find that any of the evidence relied upon in the warrant to search the motel room was obtained illegally, it is unnecessary to reach Defendant's argument that the evidence seized as a result of the search warrant should be suppressed because the warrant was based on Defendant's statements in the motel and during the interrogation.